```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

CHELSEA FREDERICK, et al.,      )
                                )
               Plaintiffs,      )
                                )
     v.                         )    No.  09 C 6837
                                )
THE BIOGRAPHY CHANNEL, et al.,  )
                                )
               Defendants.      )
```

MEMORANDUM OPINION AND ORDER

This action by Chelsea Frederick ("Frederick") and Ferrara Daum ("Daum") against The Biography Channel, A&E Television Networks LLC and the Greif Company (collectively "Media Defendants") as well as the City of Naperville ("City") stems from a highly disturbing outgrowth of a collaborative arrangement entered into in September 2007 between Media Defendants and City. All defendants have joined in filing a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the Complaint, and plaintiffs' counsel has filed a 15-page responsive memorandum as to Count One. Because those submissions have met head-on, the motion is ripe for decision-- and for the reasons stated here, it is denied.

### Facts[1]

Media Defendants conceived a TV series entitled "Female

---

[1] As is always the case with a Rule 12(b)(6) motion, this opinion credits the allegations in the Complaint. Although that does not equate to the making or implication of any factual findings, here the material that both sides have submitted in conjunction with their briefing of the current motion appears to confirm the accuracy of those allegations.

Forces" that would feature City's female law enforcement officers and would be telecast on The Biography Channel (Complaint ¶6). That plan was memorialized in a September 19, 2007 agreement ("Agreement") between A Day With, Inc. (the entity utilized by Media Defendants for that purpose) and City, a copy of which Agreement plaintiffs' counsel has attached to plaintiffs' responsive memorandum.  Media Defendants and City proceeded with the filming of the TV series in accordance with the Agreement.

At some point during 2008 Naperville resident Frederick, then 20 years old, was subject to an outstanding warrant stemming from her failure to have appeared at a traffic court hearing (Complaint ¶8).  When a male Naperville police officer went to the apartment building in which Frederick lived to arrest her on that outstanding warrant (id.), Frederick and her older sister Daum came out of the apartment building "to go for a meal at a local drive-thru restaurant, dressed very casually in pajama pants and not intending to be seen by anyone" (id. ¶9).

Although the male officer could readily (and immediately) have arrested Frederick on the warrant or asked for a suitable bond, he detained both Frederick and Daum to await the arrival of a female Naperville officer and the camera crew that was assigned to film Female Forces, doing so for the express purpose of having the arrest filmed for the TV show (id. ¶10).  When the female officer and camera crew arrived, the camera crew staff told

Frederick and Daum "that they were filming a 'documentary' about the Naperville Police" (id. ¶11).  Frederick responded "that she did not want to be filmed or shown on television, especially informally dressed in pajama bottoms" (id. ¶12).[2]

Both Naperville officers and the camera crew ignored Frederick's objection to filming (id. ¶14), and the officers proceeded to arrest her "because she was unable at that moment to post a modest bond with cash or a credit card" (id. ¶15).  At that point the camera crew filmed the arrest for the Female Forces TV series (characterized in Complaint ¶16 as a "commercial" series, not a "documentary" film), with Frederick unable to prevent that filming because of the officers' presence and her compelled presence due to the arrest (id. ¶17).[3]  Frederick was not only arrested but was searched and handcuffed (id. ¶19), with her pajama bottoms falling down her hips--something that she could not prevent because of the handcuffs (id. ¶20).  Her statements of concern (id. ¶21) were ignored, with the camera crew filming her being led in handcuffs to the police car (id. ¶22) and "focus[ing] attention on Chelsea Frederick's falling pink Hello Kitty pajama bottoms and

---

[2] Although Daum assertedly shared those views (id. ¶13), there is no allegation that she spoke up to the same effect.

[3] Complaint ¶18 alleges that though Daum was not physically restrained from leaving, she felt compelled to protect her younger sister Frederick.

indecently exposed skin about the waistband of her pajamas (id. ¶23)."

Next Frederick was placed in a holding cell at the Naperville Police Station (id. ¶25). Though that was a secure restricted area not accessible to the public (id. ¶25), a member of the camera crew was admitted to that area by the Naperville Police (id. ¶26) and proceeded to ask her to sign a release form authorizing the use of her likeness and identity (id. ¶27). Frederick refused (id. ¶28). Frederick's custodial status was later terminated when Daum posted bail for her (id. ¶31).

With Media Defendants having captured the just-described episode on both film and a sound recording, it was included in Episode 5 of Female Forces, which was telecast about November 2, 2008 on The Biography Channel throughout the United States and then later in foreign countries (id. ¶33). Although some segments of Episode 5 blurred and rendered nonidentifiable the likenesses and identities of some other persons (id. ¶35), the portion dealing with Frederick's arrest "prominently and clearly show[ed] the likenesses and identities of Chelsea Frederick and Ferrara Daum, both of whom did not want to be shown on television" (id. ¶36).

Moreover, Media Defendants' production of that incident edited the voice portion to delete Frederick's statements that she did not want to be filmed or shown on television (id. ¶37).

In addition, the aired episode "contains a voice-over by the female Naperville police officer that the twenty-year old girl being arrested was 'concerned about the state of her pants'" (id. ¶40).

There is more, but a good portion of it is primarily relevant to plaintiffs' state law claims that are not addressed in this opinion. What has been said here suffices to provide the framework for analysis of plaintiffs' Count One Section 1983 claim.[4]

### Federal-Question Claim

Count One of the three-Count Complaint seeks to invoke 42 U.S.C. §1983 ("Section 1983") against all defendants. Although City is by definition a "state actor" for Section 1983 purposes, Media Defendants first take aim against that Count on the premise that they are not--they contend that they did not operate "under color of" the law of any state or lesser governmental unit, as Section 1983 puts it.

But that narrow reading of the scope of Section 1983 is excessively myopic--after all, it was almost a half-century ago that the seminal opinion in Burton v. Wilmington Parking Auth.,

---

[4] This Court had orally directed plaintiffs' counsel to respond only to that claim, because if defendants had proved successful in dismissing Count One the nearly certain disposition of the state law claims would have been a without-prejudice dismissal because of the absence of a viable federal-question claim to which they could attach under 28 U.S.C. §1367.

5

365 U.S. 715 (1961) established the principle, adhered to ever since in a host of cases, that a symbiotic relationship between a governmental body and a private party can place the private party squarely in the crosshairs of the Fourteenth Amendment.  Under the circumstances of this case, that principle clearly draws these Media Defendants within the ambit of Section 1983.

If there were any legitimate question on that score (and there is not), the Agreement between City and Media Defendants would squelch any argument to the contrary.  That formal contract linked Media Defendants and City into far more than a mere symbiotic relationship.[5]

Hence step one of the analysis plainly ties Media Defendants and City together for Section 1983 purposes:  If then a federal constitutional deprivation resulted from Media Defendants' actions that implemented the understanding those parties had reached, Media Defendants as well as City would bear responsibility under Section 1983.  This opinion therefore turns to that issue.

---

[5] In terms of the present action, it is of more than passing interest that City evinced solicitude for its own Police Department members and employees (1) by limiting the Media Defendants' permission to film and record such persons to those "who consent to such Recording and sign an individual release provided by ADW" (Agreement ¶2) and (2) by specifying that "employees who do not sign such a release will not be recorded" (id.).  No such solicitude was evidenced by City for its civilian populace, and Media Defendants obviously had no interest in providing any such safeguards either.

For that purpose the obvious constitutional candidate is the Fourth Amendment (as incorporated by the Fourteenth Amendment), with its prohibition of unreasonable searches and seizures. As to the first of those prohibitions, more than a decade ago <u>Wilson v. Layne</u>, 526 U.S. 603 (1999) held that the Fourth Amendment is violated by a search when the bringing of media involvement into what would otherwise be permissible police action serves no legitimate law enforcement purpose. That unanimous opinion, authored by then Chief Justice Rehnquist, was echoed on the same day in the per curiam opinion in <u>Hanlon v. Berger</u>, 526 U.S. 808 (1999).[6]

In the very next year the Court of Appeals for the Second Circuit held that the Fourth Amendment had been violated--this time as an unreasonable seizure rather than an unreasonable search--under circumstances eerily similar to those in the present case (<u>Lauro v. Charles</u>, 219 F.3d 202 (2d Cir. 2000), where--just as here--the media involvement had been artificially created for no law enforcement purposes but only to create a camera opportunity). As <u>Lauro</u>, <u>id</u>. at 209 put it, the

---

[6] That ruling was issued in review of an opinion issued by the Court of Appeals for the Ninth Circuit (sub nom. <u>Berger v. Hanlon</u>, 129 F.3d 505 (9th Cir. 1997)) that had explained in accurate detail the basis for considering "The Media as Government Actors" (<u>id</u>. at 514-15). Because the Supreme Court's ruling left that excellent lengthy analysis untouched, plaintiffs' Mem. 8-9 in this case has quite properly reproduced that analysis verbatim.

7

question--one that the court answered with a resounding "Yes"--was "whether what occurred in this case constitutes an improper exacerbation of an otherwise lawful seizure." On that score the Second Circuit's analysis, and the Lauro opinion itself, might well have been written for this case.

To be sure, Lauro involved only a defendant who was a formal state actor--a police detective--so that the court had no occasion to speak to the possible liability of nonparty Fox Five News, which had filmed and later telecast the so-called "perp walk" in that case (id. at 207-08). But as this opinion has already held, in this instance Media Defendants also acted under color of law, so that the same "improper exacerbation of an otherwise lawful seizure" makes them proper targets of plaintiffs' Section 1983 claim.

Nor is Lauro an outlier, standing alone in recognizing Fourth Amendment vulnerability in circumstances comparable to the present one. As already stated, its impeccable credentials are based squarely on unanimous Supreme Court precedent, and it is additionally instructive to read the first-rate student note by Hannah Shay Chanoine in 104 Colum. L. Rev. 1356, Clarifying the Joint Action Test for Media Actors When Law Enforcement Violates the Fourth Amendment, as well as the additional cases cited

there.[7]

In sum, Count One survives defendants' Rule 12(b)(6) attack. All of defendants' arguments that focus narrowly on the scope of any asserted constitutional right of privacy miss the mark entirely, for they do not speak at all to the Fourth Amendment issue of an unconstitutionally unreasonable seizure as such.[8] As for defendants' objection to potential Monell liability on City's part, at this threshold stage it appears that what happened to plaintiffs here involved the direct and first-hand implementation of City's entry into the Agreement with Media Defendants, rather than Section 1983 being invoked on the basis of vicarious liability (and that distinction is enough for the claim to

---

[7] This Court has of course read the cases sought to be adduced by defendants (who were good enough to supplement their submission with printouts of the unpublished (and nonprecedential) opinions that they cite. None of those alters the analysis here (indeed, the single Court of Appeals order tendered by defense counsel--Wilson v. "Hardcopy," No. 94-2939, 1995 U.S. App. LEXIS 31437, at *4-*5 (7th Cir. Oct. 13) expressly recognized the "state action" potential for private party liability under Section 1983, as this Court has found it exists in this case).

[8] This Court should not be unduly critical of defense counsel in that respect, for plaintiffs' counsel have also written the Complaint and their responsive memorandum with a similar bent (though not exclusively so). And although the relevant caselaw also talks in part in terms of privacy considerations, the cases that are relied on here do so only as an adjunct to the discussion of what constitutes an unreasonable search or seizure--the pure constitutional criteria. By contrast, the limited privacy-only approach followed in defendants' memorandum leads the discussion into byways that do not assist the proper constitutional analysis.

survive dismissal at this point, though the issue may perhaps be revisited at a later point).[9]

Finally, because this Court had earlier said it would defer consideration of the Complaint's state-law claims until it had determined whether a federal-question anchor existed to support 28 U.S.C. §1367 supplemental jurisdiction, it directs plaintiffs' counsel to respond to defendants' memorandum in that area on or before February 19, 2010. In the meantime, all defendants are ordered to file their answers to Complaint Count One on or before that same date. This Court will retain the February 5 status hearing.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 4, 2010

---

[9] Because plaintiffs' responsive memorandum did not speak specifically to the viability of the separate claim by Daum, a subject spoken of briefly at Defendants' Mem. 3, no ultimate ruling is being made here on that score.